Good morning, Your Honors. I'm ready to proceed. Why not, sir? As Attorney Andrew Knapp, I represent the petitioner in this case. This is an asylum case. The position today is that the immigration judge's adverse credibility determination is not supported by substantial evidence, nor is the immigration judge's alternative holding that the petitioner did not suffer past persecution. That, as well, is not supported by substantial evidence on the basis of the case law of this circuit. In the immigration judge's decision, the immigration judge lists at least 16 different reasons for doubting the petitioner's credibility. None of those reasons passed muster under the case law of this circuit. Suppose just one or two of them did. If one of the reasons given by the immigration judge is a cogent reason that bared on the heart of the asylum claim, then yes, substantial evidence would support that adverse credibility determination. But it's my opinion that none of the reasons that she cited were sufficient. To briefly go through as many as I can touch. It's very hard for an I.J. to make an adverse credibility determination because practically everything that a trial fact normally uses, things like demeanor, don't count because they have to be articulable. And, of course, they'll say I looked at the witness and the witness looked shifty to me, you know, whatever there's a time to just say or, you know. That kind of thing an I.J. can't use. I mean, it's very hard to make an adverse credibility determination under a case law. Yeah, under the case law it is, but I would disagree that it can't be done. I was an asylum officer for the service in 93 of 94, and our proceedings were less adversarial. We could spend as much time as we wanted to with the asylum applicant. And what we would do is we would just continuously follow up with questions. When we got a general answer, we could. Well, here there was a follow-up on her demeanor because she commented on long pauses between his answers. Well, that's correct, but just as this Court doesn't accept implicit credibility determinations, you shouldn't accept an implicit demeanor determination. Nowhere in the judge's decision did she state that she found that the demeanor made the petitioner not credible. She talked about pauses. Well, pauses are a form of demeanor. You know, you could answer a question promptly and you can hesitate. I don't know how long a hesitation one would expect if somebody were just sort of trying to formulate, you know, the right words to use. A few seconds from a case is a lot longer than that. You would say they were trying to figure out how to tell a consistent lie, you know, at least trial fact. And so here she says, you know, there were pauses, which I, you know, it's a matter of judgment how much of a pause is indicative of fabrication. But the testimony doesn't necessarily reflect those pauses. I take it as a question. How would they? Court reporters don't take down pauses. You know, a question is asked. If you ever read a transcript and compare it to what an actual court hearing looks like, it looks very different. That's correct. But, again, the testimony starts off badly when one of the first questions is when did you receive a threat, and the Petitioner answers with a date after he had already left the country. But within the same sentence, he corrects himself. And after that, he was, you know, put on notice that he had to be extremely careful as to what he had to do. Kennedy. But he had to keep correcting. In fact, cross-examination helped him correct some of the things that he. Well, the cross-examination is a good example of where there's no substantial evidence supporting the inference that the Petitioner was not credible. In the Petitioner's direct testimony, he testifies specifically that in 1992, before leaving the country, there were two separate written death threats. One in July of 1992, and then the other one within days of his leaving the country. Then when the trial attorney, when the government's attorney cross-examines him, he asks the leading question. So the last threat that you received was in July of 1992. And he said, yes, except for the threat that I received a few days before I came here. But that was completely missed by the immigration judge. The immigration judge assumed that there had been a contradiction, which there was not, in fact. The prosecution, the persecution of his other brother. The persecution of his brother, that was one of the factors. Was there an inconsistency? It's not an inconsistency. The immigration judge stated that nowhere in the asylum application did Petitioner list the continued threats and persecution against his brother. But what you have to understand is Petitioner left the country on September 1st of 1992, and his asylum application was completed with the help of a notary in November, no, in December of 1992. The Petitioner in the testimony related incidents where his brother had vaguely informed him about continued threats and attempted kidnapping that couldn't have been contained on his asylum application because he wasn't aware of it at the time that the asylum application was prepared. So I don't see how that is an inconsistency. Kennedy. How about appearances at his home by guerrillas? Excuse me, Your Honor? Appearances at his home by guerrillas. Again, that was not an inconsistency. The asylum application that was very poorly prepared indicates that there was an attempt on his life by the guerrillas. In his testimony, he states that in 1990 the guerrillas came to his home looking for him, roughed up his family, and couldn't find him because he was away on personal business. When it was brought to his attention that his asylum application contained a statement that the guerrillas had attempted to murder him, he was able to coincide his testimony with that application by stating that that's what he meant. If he had been home, he would have been killed. Ergo, an attempted murder attempt. So I would disagree that that's supported by substantial evidence under this case law. I recognize reasonable minds might differ, but is that the measure? Do we look to see whether reasonable minds might differ, or do we look to see whether there's a basis for the finding of inconsistency? You look to see if there's substantial evidence for the finding, and reasonable minds could differ. But the adjudicator is controlled by the precedent decisions of this Court. And for each one of the alleged inconsistencies, I have a little card prepared where there's case law directly on point that indicates that that's not a proper basis for an adverse credibility. And I'd also like to point out to this Court that basically there was about 100 questions posed to the Petitioner by his attorney, 33 questions by the trial attorney, and the judge maybe asked more questions. But whenever the Petitioner would make statements that were vague or that suggested an inconsistency, there was no follow-up question saying, well, what do you mean by that? What do you mean by the fact that the threat came mostly from the guerrillas? He was never given an opportunity to explain these perceived inconsistencies. It was only until the judge's decision. How about the dates of his employment with the local municipality? Again, he provided an explanation for that. His asylum application states that he was employed with the municipality beginning in 89, but that the first threat where he was personally confronted by the guerrillas occurred a year before, in 88. And when that was brought to his attention by his own attorney, not on cross, not by the judge, he explained that his family had worked for the government. There's evidence that his brother, who was killed, had worked for the government, and that beginning at an early age, he assisted them. And so it's not an inconsistency that they would have asked him not to continue working with the government, despite the fact that his official position with the government didn't occur until the following year. I mean, but he couldn't indicate what position or what he was doing. I mean, it's really quite vague about the whole connection to the government. It was, you know, maybe it's believable, but the I.J. found it unbelievable. So, you know, it's just too vague. He can't tell us what kind of stuff he did, who employed him, who paid him. Well, there's two separate parts to that. There's the part to when he was actually a paid employee for the government, and he was very specific that he received fees that were required in connection with the conduction of a census that would lead to voting rights and voting allocations. And then what he was vague about was when allegedly he had began working with his family for the government at 10, what his duties were then. And he did specifically say, whatever was asked of me, filing, getting coffee, it doesn't seem that that's sufficient without giving him an opportunity to first, you know, explain the perceived inconsistency, to follow up with questions if there's doubt as to the explanation. Nor is there discussion by the immigration judge why that explanation has been rejected as not resolving the economy. But that's the clarifying thing is this is a lawyer's job. This is not like appearing before an asylum officer. This is not a fair proceeding. And it is not an inquisitorial proceeding. It is a fair proceeding. And in fact, if the judge gets too involved in the process, we sometimes say, you know, the judge is taking sides and shouldn't. I mean, there's some discussion, of course, to do that. But there comes a point when the judge, if the judge is carrying the load too heavily, we wonder whether he got or, you know, she got too involved in the process. The way to have brought out more specific answers for his lawyers would have asked them more specific questions. Either on redirect or what? There's, again, case law that says that the immigration judge has the obligation to allow for sufficient testimony that when there's a perceived inconsistency, it's up to the immigration judge to bring it to the attention of the Petitioner and to give the Petitioner an opportunity to provide an explanation. There's also case law that says we reverse if the record indicates that a prior fact would be compelled to reach a different result. Well, correct. But there's also case law that says that to support an adverse credibility determination, if the reasoning given by the immigration judge for each instance of not finding the Petitioner credible violates precedent decisions of this Court, then that's not substantial evidence. In addition, I would like to point out that the majority of the reasons that the immigration judge stated for not finding Petitioner credible is the fact that his testimony gave greater details than those details that had been listed on his asylum application. You know, you are out of time. I have a question, if we get past this credibility issue. The claim, his claim is he was being threatened by the guerrillas because he was working for the government. I'm wondering what basis there is for future, I mean, he's no longer working for the government, hasn't worked for the government for quite some time. Since the nature of the claim threat was, you know, we'll leave you alone if you just stop working for the government, it's not clear to me how this is a basis for future prosecution, given that he essentially did what the guerrillas wanted him to, not that he should have been required to do it. But if he now comes back, there's been no indication at all that where they said, even by his own allegations, that he said, oh, even if you're close to the government, we're going to get you anyway. Well, I would agree with Your Honor that at the minimum, a remand would be required to resolve these issues because our position as the immigration judge incorrectly I don't think I said that. Okay. If you may be agreeing with somebody, but you know, let's say, I just asked a question about the existence of future, which is really the test for asylum, is he really going to be subject to future prosecution? We have that evidence about the 96 normalization and all that, but putting all that aside, putting all that aside, which is still a hurdle for your client, it just didn't look to me like the threat was the kind of threat that would still be in effect when he got back by his own, by his own. So doesn't that support the IJ's determination that there is no threat of future prosecution? No. And for two reasons. The first is, it's our position that the finding of no passive persecution because of the fact that Petitioner was not personally harmed is erroneous under the case law of this circuit. And the second point is, is assuming there was passive persecution, the burden is on the government to establish changed circumstances that would rebut the presumption of future persecution. In addition, case law of this circuit, including such cases as Cardenas, which dealt with Peruvian nationals, indicate that where a specific threat is made in the context of a situation where these threats are taken seriously and often carried out, that is sufficient to establish a well-founded condition. Even if it's a conditional threat and the condition is no longer applicable. If he were to return. It says, if you don't do this, we will kill you. He, in fact, by leaving, does exactly what it is they want him to do. But by returning, he would then again be. Only if he works for the government. Not necessarily. Well, he said. They said, look, quit working for the government or we'll kill you. You know, because it's a short amount of time. The threats seem to be directed to getting him to stop doing certain things. Well, I can only go by what's in the record. He testified that if he were to return, he would continue to be involved in his community. He believes that returning would be violating the conditions of the threat, that he leave and not come back. He wouldn't be returning voluntarily. It would be under an order of removal. But he would then face the danger. And there's a reasonable possibility. There's country conditions that were submitted both by the government and by the Petitioner's attorney, which established that continued persecution by guerrilla insurgents occurs. So I would argue that the alternative finding can't hold because under the case law, since he was closely confronted, members of his family were roughed up. He actually had a personal contact with the guerrillas in 88 where they personally threatened him. All of that gets over the limb hurdle as to showing that he was closely confronted and it establishes that the threats he received did amount to past persecution. There's a presumption the service can have an opportunity on remand to try to overcome that presumption. But I don't think they effectively did in the proceedings below because they cited a 1997 country conditions report that indicates that continued persecution by the guerrillas occurs. And then the judge faulted him for submitting a later dated article that the guerrillas were still active because it was out of date by the time of the hearing. Thank you. We'll hear from the government. Okay. May it please the Court. Daniel Maron from the United States Department of Justice on behalf of the Respondent, Attorney General John Ashcroft. I'd like to begin where the Court left off with the question of persecution. And that is, here the immigration judge reasonably and correctly concluded that even if he took all the testimony as true, it didn't establish such severe conduct against the Petitioner himself as to amount to past persecution. And the significance of that is that it then became and remained his burden to prove the reasonable likelihood of future persecution, and he didn't do that. I'm sorry. Even if he believed everything he said, or? Yes. Even if he believed everything he said. What he testified to, Judge Kaczynski, was. Repeated death threats. Repeated death threats. And under limb, unfulfilled threats in and of themselves are relevant and sometimes compelling with respect to a likelihood of future. There was a little more than that here. Maybe not a lot more, but this were just sort of empty threats. They came to his house. He happened not to be there. They roughed up his mother. Actually, there's no evidence that he roughed up his mother. That's a slight exaggeration of the records. The records said he said it was they were not harmed, but they were mistreated, which I think it's not clear if he just means they were brusque. You're going to quibble with me about whether roughed up and mistreated is? Well, I mean. Okay. Fine. There was. They broke into his house. Actually, I read the testimony three times. He never said they broke. He says they came into his house. They came to his house. He doesn't say they broke into his house. But in any event. They said that he murdered his brother? Actually, very interestingly. I mean, this is more about credibility. With respect to the glaring inconsistency between the testimony and the asylum application is there's no mention whatsoever during the hearing of the murder of his brother. That's quite an omission when that was the most striking allegation in this asylum application. And after being given a continuance of a year and a half and procuring two to three declarations on other subjects, he provided not one shred of documentary evidence that he ever had a brother that was killed. But with respect to even if it were true, the majority of this Court's cases when dealing with harm to similarly situated family members, analyze that as going to whether there's a reasonable likelihood of future persecution against the individual, not as an instance of actual past persecution against the Petitioner. It's a similarly situated individual who has received harm, and that clearly does go to whether there's a future likelihood of persecution against the individual, but it's not itself an indication of past persecution. The one case that postdates Lim in which Petitioner cites that arguably does that is Salazar-Pakower, which in my view is the exception which proves the rule. And in that case, the individual, Shining Path, attempted to target the Petitioner, and when they couldn't find the Petitioner, they beat up his family in an attempt to punish and intimidate him. In other words, he was the target, and in an attempt to punish him, they took people that he loved and hurt them. That's not at all the evidence here. Here the evidence was that even if you credit it as true, the harm to the family, to his older brother, the alleged murder, occurred when he was a very young child. It was not in any way an attempt to harm him. It was at best evidence of similarly situated people being harmed, which goes to future persecution. Now, but when you come to future persecution, the Petitioner's got a real problem, which is that his own application for asylum, Question 19, said that he feared that he would be harmed if he returned, quote, unless there was a peace agreement with the guerrillas. Well, of course, in 1996, there was a peace agreement with the guerrillas. And the 1997 country report by the State Department, which was admitted into evidence, says that although there was continuing criminal violation, sorry, criminal violence after the peace agreement, that political violence or political risk from the guerrillas since the guerrillas disbanded, if at all continued to exist, only was an issue for the highest level of most senior former members of the regime and only in their home cities. In other words, that they could relocate to other parts of the country and avoid the harm. And in Gonzales-Hernandez, this Court, based on the very same country report that was submitted here, same year, same country, said that that report was sufficient to sustain the INS's burden where there was a finding of past persecution, to rebut it by proving no future risk of persecution. So a fortiori, it seems to me, that the existence of that report in the record has to be sufficient to sustain the case.  So which case was this again? Katyal. Gonzales-Hernandez. It's cited in our brief. Gonzales-Hernandez v. INS. And so a fortiori, it must be sufficient to sustain a finding here by the immigration judge that he did not carry his burden of proving future persecution. And with respect to the argument regarding inconsistencies? Yeah. With respect to credibility, there are a number of things. First of all, Judge Kaczynski, with respect to demeanor, in Paredes or Estorazo, which is 36F3rd at 819, this Court did say that where a demeanor finding is based on specific articulable descriptions, and they specifically mentioned modulation of pace as one such instance in which where a judge sees the witness, says there's a modulation of pace, which is exactly what he said here, what she said here. What she said was that with respect to most answers, most questions, he was very forthcoming, very quick in his answers. When it came to describing the threats, long pauses. That, to me, is absolutely the type of specific articulable reason that should sustain a demeanor finding. And this Court, in the case I mentioned, said that demeanor findings are worthless. The trouble with that, and I recognize what we've said in the case, but the trouble with that is this. You're talking about an area about which there's no emotional overlay. You may move at a pretty fast clip. But when you start talking about torture, you slow down because of the pain that might be associated with it. Now, I'm not suggesting the case doesn't say what you said it said. So when I was asking him about the modulation, I thought he might have had some reason. There is a rational basis for a change of pace. I mean, there can be a rational basis for a change of pace. And this record doesn't. It doesn't definitely show it. But he did argue. So there we are. I'm sorry. Your Honor, Justice Ferris, here what the judge said was that there's a significantly slower pace when he testified about the four subsequent threats than the one he received personally. And it's very hard to believe that the one he received personally, he was less emotional about than the written threats he received subsequently. So I think on this record, although that's a distinct possibility in other situations, that's not, I think, a sufficient basis to compel a contrary conclusion, which is what happened here. There's the inconsistency, the failure to obtain any corroborating evidence, where it was he himself thought it would be available. He said it was going to he asked for continuance. He obtained a year and four-month continuance in order to provide a death certificate, did not obtain one, did not produce any documentary evidence, and nor did he get up and testify and said, Your Honor, I tried to get a death certificate. Here's what happened. Just absolute silence on that. In fact, absolute silence about the — You were trying to get a death certificate for the death of the brother in 84? Correct. And he did not get on the stand and say, Your Honor, I tried, and here's what I did, and I couldn't get it. He didn't obtain a declaration from other people in the way on this subject in the same way he did as to other subjects, nor did he actually get up in his testimony, testified at the hearing as to threats and as to an attempted murder of another brother after he left. Not one mentioned by him in his testimony about the supposed murder of his older brother, which you would think would be a very significant detail. In fact, it was the most striking allegation in his written application. So in addition to which inconsistencies in dates, he initially testifies that his first threat is a year before he started to work for the government. And he then says, oh, yeah, I used to work at something else, but when it comes to something else, he can't describe what it is or who paid him. I think on this record, there's more than sufficient evidence to sustain the immigration judge's finding. So, Your Honor, unless you're going to permit me to explain why burglary and — why the burglary analogy does stand up, I'm done with my argument. You know, you — Sure. That's not your argument, but go ahead and give us an idea if you want to. Your Honor, well, I'd like to give it a shot. I think we gave her every opportunity to tell us why, because even though her opponent didn't pinpoint it, I hope I brought it out. I tried to bring it out and say, now, she's — you're going to have to answer that. Judge, and you're also talking about the other case that we were arguing. The other lawyer's gone already. I know. That's why. No, that's all right. But you were just the last case, so we were giving you the — A quick theory, though. A quick theory. I think maybe we could hear it. It seems to me — it seems to me in the — in the burglary situation, you have a State crime where there's an element that says building, but only a subset of that element, homes, is sufficient for Federal standards. If the case law in this circuit says, well, there you can look at the evidence outside of other documents to see whether home was — that particular subset of home was the building in question, I'm not sure I see an analytical distinction between that and a criminal statute. You know, when you — when you read the opinion, you will. Let's just leave it at that. And the other — You — you will — you will ultimately lose on this issue, whether it's before this panel or before the Supreme Court. There's no way you can win that issue. You know why you can't win on it? Because they charged a crime. They could have charged the heavy a crime, but they didn't. It's a fact they withdrew. There was a prior thing and they withdrew it. Then there's, I think, a question as to whether the scope of the guilty plea as to — I don't know that they withdrew it. I assume they withdrew it because I don't know why, when it's clear that the child is 11 years old, you don't allege it. So there has to be some reason that they didn't, don't you think? I will. And, Judge Kaczynski, I will look at the case. Thank you. Thank you. And, in fact, you know that you were talking about a case, but you weren't — you couldn't have argued it because somebody has argued it and gone home. That's what the judge was pointing out to you. It's not a tough impression problem. You will read the opinion. You will see the light. Mr. Knapp, you are out of time. Would you like a minute or so for a bottle? Do you have your brief with you? I do have the brief. We should have brought it up with you. All right. Go ahead. Okay. Well, what I would like to say is there has been new case law recently on a panel that Judge Silverman was on, on Lopez v. Ashcroft. Part of the holding of that decision was that a remand was necessitated by the fact that the administration, the agency, never considered the Convention Against Torture claim. Now, at the time of the immigration court hearing, the regulations that promulgated the Convention Against Torture process in the immigration court had not yet been published. That was until March 22nd. But according to regulations, as of March 22nd, any pending application for asylum and withholding automatically included an application for a CAT claim. The BIA never addressed that in its decision. In fact, it's a summary affirmance without opinion. So I would ask that you consider the Lopez case as precedent to have reason to remand the case back to the agency. Oh, that's the one that has Judge Silverman on the panel? Excuse me, Your Honor? That's the one that has Judge Silverman on it? Yes, that's correct. That'll probably get reversed. Yeah, yeah, exactly. If you know the difference that you've got in the case and you've tried to explain why the inconsistencies don't matter, and maybe you could have convinced us right back to that. But we have to look in the review and we have to say the tri-effect was compelled to reach a different conclusion. Otherwise, we're through. And you can't. You tell me why that's not true. You can under the case law. Because in addition to the fact that there's a deferential standard of review, once you make a decision and you tell the immigration judges how they're supposed to apply the law, they have to. They have to allow the applicant to explain any perceived inconsistency. Then they have to comment on why that explanation is accepted or rejected. But it seems to me an easy solution. And we have to give him a year and a half to produce some additional evidence. And he doesn't produce it, doesn't explain why he didn't produce it, doesn't say anything about it. But she's compelled to reach a different conclusion. Well, there's a case law. Judge Silverman was also on the panel in the Cinco case. It says when there's reason to doubt credibility, you can ask for corroborating evidence. But when corroborating evidence is provided, you can't ask for additional corroboration. He had notarized declarations from people working in the committee that he belonged to that the threats there continued. He had newspaper articles from Guatemala translated showing that the guerrillas were still active. And yet the judge faulted him without any prior notice for not bringing additional documentation such as evidence that other members of the committee had been killed by the guerrilla when the way they were killed is consistent with the country reports and evidence. And Sidhu also says that foreign documents were almost never easily available. And just if I might add, Sidhu was granted relief on remand. So the case law supports our position, but I think the most expeditious way to dispose of this case is to see that the CAT claim was raised in the brief to this Court. The BIA didn't consider the CAT claim. We're reviewing the immigration judge's decision. At the time, there was no CAT claim. I think it should be remanded to the BIA, because even where an applicant is found not credible, that doesn't dispose of the CAT claim. And that's what this Court held in Colmathus. So I would ask that in the alternative that you don't find that substantial evidence does not support the adverse credibility, and in the alternative that you don't find that my client was a victim of past persecution, that you remand it so that the agency can decide what they're going to do with this pending CAT claim. Thank you. And thank you, Case Society. We'll stand submitted. Mr. Knapp, don't go away. Turn to page 17 of your brief. Uh-oh. I'm going to get in trouble now. All right. You already have further trouble, you mean. Yeah. Silberman was on two panels. Do you know that you've cited a case by the name of Tarig? Yes. An unpublished case. That's correct, Your Honor. I realize my mistake. There's three unpublished cases that I cited, too, which Mr. Silberman was on those panels. And I apologize profusely and I accept any sanction the Court might want to pose against me. Why don't you send us a letter withdrawing portions of the brief and explaining
judges: Farris, Kozinski, Silverman